# In the United States Court of Federal Claims

No. 13-390
(Filed: January 9, 2018)

* * * * * * * * * * * * * * * * * * * *

VIRGIN ISLANDS PORT AUTHORITY,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant.*

U.S. Const. amend. V; illegal exaction; constitutional takings; 48 U.S.C. § 1469c (2012); V.I. Code Ann. tit. 29, § 543(12) (2017).

* * * * * * * * * * * * * * * * * * * *

*Nycole Alicia Thompson*, St. Thomas, U.S. Virgin Islands, for plaintiff, with whom was *Geoffrey Eaton,* Washington, DC.

*Elizabeth Anne Speck*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

## OPINION

BRUGGINK, *Judge*.

    This is a claim by the Virgin Islands Port Authority for return of wharfage and tonnage fees. Plaintiff contends that United States Customs and Border Protection effected an illegal exaction or a Fifth Amendment taking by collecting such fees without remitting them to it as rightful owner. Pending is the government's motion for summary judgment and plaintiff's partial cross-motion for summary judgment. The matter is fully briefed, and oral argument was held on December 5, 2017. For the reasons set out herein, we grant the government's motion for summary judgment and deny

plaintiff's cross-motion.

BACKGROUND

The United States Virgin Islands ("Virgin Islands") is a collection of islands that the United States acquired from Denmark in 1917. They are administered as a single territory and share a common government. The Virgin Islands had customs law in place at the time of acquisition by the United States to govern its maritime ports. This conflict has its genesis in a determination of who rightfully collects wharfage and tonnage fees levied at the Virgin Islands ports and what must be done with those fees once collected.

Three entities are involved in the dispute: the Virgin Islands Port Authority ("VIPA"), the United States Customs and Border Protection ("CBP"), and the government of the Virgin Islands. The Virgin Islands government created VIPA in 1968 to own and manage "any and all types of air and marine terminals" and "to control the harbors of the Virgin Islands." V.I. Code Ann. tit. 29, §§ 541(a), 543 (2017). The Virgin Islands established VIPA as "a public corporation and autonomous governmental instrumentality" of the Virgin Islands government. *Id.* § 541(a). Moreover, the Virgin Islands code provides that VIPA's "receipts, expenditures, accounts, funds, facilities, and property" are owned by VIPA, not the Virgin Islands government. *Id.* § 541(e). The Virgin Islands authorized VIPA "to determine, fix, alter, charge, and collect reasonable rates, fees, rentals, ship's dues and other charges." *Id.* § 543(12). VIPA began by collecting the fees and ship dues levied by Virgin Islands law prior to VIPA's creation and then VIPA changed rates and levied new fees. *Id.* The fees VIPA collects contribute to paying its expenses. *Id.*

Pursuant to this statutory authority, VIPA sets the rates of wharfage and tonnage fees at the Virgin Islands ports, although, until 2011, it did not collect those fees. That task was performed by CBP. CBP, although originally a unit of the Treasury Department, is now governed by both the Treasury Department and the Department of Homeland Security, depending on the function CBP performs. 19 C.F.R. § 0.1(a)(1) (2017). As a part of the Treasury Department, CBP's authority to administer customs law in the Virgin Islands derives from the 1936 Revised Organic Act which designated the Secretary of Treasury as administrator of Virgin Islands customs law. Virgin Islands Organic Act of 1936, ch. 699, § 36, 49 Stat. 1816 (1936) (current version at 48 U.S.C. § 1406i (2012)); 19 C.F.R. § 7.2

(2017).

A 1993 Customs Directive regarding operations in the Virgin Islands explained that the "U.S. Customs Service has been providing services to the Virgin Islands (VI) on a reimbursable basis since the 1960's." Def.'s App. 73. The parties do not dispute that CBP has in fact collected the wharfage and tonnage fees set by VIPA since 1969. The current claim is for return of fees collected by CBP between 2008 and 2011. The following background traces the authority to set and collect wharfage and tonnage fees at Virgin Islands ports.

After acquiring the Virgin Islands, Congress enacted the 1917 Organic Act to govern the relationship between the United States and the Virgin Islands. The Organic Act stated that, until Congress provided otherwise, the customs law and regulation currently in effect in the Virgin Islands would continue in force and effect to the extent that it was not inconsistent with United States law. Virgin Islands Organic Act of 1917, ch. 171, § 4, 39 Stat. 1133 (1917) (current version at 48 U.S.C § 1395 (2012)).

The customs law and regulation in effect at the time of the 1917 Organic Act was prescribed by Danish Law No. 64 of April 1, 1914, and the Ordinance Col. St. T. and St. J. of August 6, 1914, which amended Danish Law No. 64. The Danish customs law imposed import duties and ship dues. Danish law defined "ship dues" as the "[t]he dues to be paid by ships entering and clearing" according to the registered tons of the ship. Ord. Col. St. T. & St. J., Aug. 6, 1914 (Denmark). Denmark appointed the Custom House as the administrator of the import duties and ship dues. Read together, the 1917 Organic Act and the Danish customs law and regulation provided that the import duties and ship dues imposed under Danish customs law continued in effect as the "customs law and regulation" of the United States Virgin Islands. The term "ship dues" has appeared consistently from the time of Danish law, through the Virgin Islands code, to the present in VIPA's Marine Tariff. The Danish law did not refer to wharfage by name or to a second port fee for the use or service of the port.

Congress revised the Organic Act in 1936, continuing in effect "all laws concerning import duties and customs," but providing that the Secretary of the Treasury would designate the ports and administer the Virgin Islands customs law. 48 U.S.C. § 1406i (2012). The Treasury Secretary would also collect duties, fees, and taxes imposed by the customs law and provide for the expenses of such collection from the collection

itself. *Id.* The 1936 Revised Organic Act also provided that all taxes, duties, fees, and public revenues collected had to be covered into the treasury of the Virgin Islands, less the cost of collection of the customs duties. Virgin Islands Organic Act of 1936, ch. 699, § 35, 49 Stat. 1816 (1936) (current version at 48 U.S.C. § 1406h (2012)). Sections 1406i and 1406h, read in tandem, provide that the Secretary of the Treasury administers the customs law and regulations, which included the Danish customs law in effect at the time of acquisition, and collects taxes, duties, fees, and public revenues.

In 1954, Congress once again revised the Organic Act. Congress provided that the proceeds of customs duties, taxes, and fees, less the cost of collection, had to be covered into the treasury of the Virgin Islands. Virgin Islands Organic Act of 1954, ch. 558, § 28(a), 68 Stat. 508 (1954) (current version at 48 U.S.C. § 1642 (2012)). Furthermore, the 1954 Revised Organic Act included a savings clause, which stated that laws previously applicable to the Virgin Islands, "including laws made applicable to the Virgin Islands by or pursuant to the provisions of the Act of June 22, 1936 (49 Stat. 1807)" shall continue in force and effect. *Id.* § 8© (current version at 48 U.S.C. § 1574© (2012)). Thus, the Danish customs law carried forward by the 1936 Revised Organic Act remained in effect. The Secretary of the Treasury continued administering customs law in the Virgin Islands.

In the 1980s, Congress amended United States law relating to Virgin Islands customs law once again. Congress authorized the Secretary of the Treasury to collect customs duties, reimburse itself for the cost of collection, and then remit any excess to the Treasury of the Virgin Islands. 48 U.S.C. § 1642a (2012). Congress also enacted a reimbursable services statute in 1980, authorizing federal agencies to provide services to territories and insular possessions of the United States. Pursuant to the reimbursable services statute,

> To the extent practicable, services, facilities, and equipment of agencies and instrumentalities of the United States Government may be made available, on a reimbursable basis, to the governments of the territories and possessions of the United States . . . If otherwise authorized by law, such services, facilities, and equipment may be made available without reimbursement.

48 U.S.C. § 1469c (2012).

4

The 1954 Revised Organic Act continued all laws applicable at the time of the revision, but it also authorized the Virgin Islands legislature to enact new laws and to amend local law. *Id.* In the intervening years between the 1954 Revised Organic Act and the creation of VIPA, the Virgin Islands legislature ended the force and effect of all local and colonial law in effect prior to 1957. V.I. Code Ann. tit. 1, §§ 6(a) (2017). The legislature made two exceptions, one of which was to expressly continue in effect the Danish customs law preserved by the 1936 Revised Organic Act. *Id.* § 6(b).

The Virgin Islands legislature also created Title 25, Navigation, which included Chapter 13, Ship Dues. Chapter 13 carries through the same ship dues provisions found in the Danish customs law, using United States currency and the United States flag instead of the Franc and the Danish flag. V.I. Code Ann. tit. 25, §§ 241-45 (2017). The Virgin Islands code does not refer to wharfage.

Since its creation in 1968, VIPA has set wharfage and tonnage fees, along with a variety of other port fees. VIPA publishes the rates in its Marine Tariff. Until 2006, in its Marine Tariff, VIPA directed that CBP would collect wharfage and tonnage fees. With respect to collection of wharfage, for example, in its 1969 Marine Tariff VIPA defined wharfage as "the charge assessed for the service or use of the wharf" and stated that "[a]ll vessels using the facilities of the Virgin Islands Port Authority shall pay to the District Director, U.S. Customs, the unloading charge of $1.25 per ton . . . ." Def.'s App. 245. The 1969 Marine Tariff also directed ship dues be paid to "District Director of U.S. Customs." *Id*. VIPA stated, "Ship Dues (tonnage or harbor dues) shall mean the fee charged a vessel for entering and using a port of the U.S. Virgin Islands."[1] *Id.*

In the 1976 Marine Tariff, VIPA once again directed port users to pay wharfage and ship dues to U.S. Customs. It directed wharfage be paid to "District Director, U.S. Customs." *Id.* at 252-53. VIPA divided ship dues into four categories: cargo, "[i]mported bauxite, coal and alcohol for fuel

---

[1]Here, VIPA listed "tonnage" as a synonym for "ship dues." Otherwise, VIPA Marine Tariffs refer to the fee as "ship dues," not as "tonnage," consistent with the Virgin Islands code and Danish customs law. The memorandum of agreement, on the other hand, uses the term "tonnage." The parties used the two terms interchangeably when referring to the port user fee assessed in terms of tons.

5

manufactures," cruise ships, and other. Def.'s App. 251. The ship dues per ton of "[i]mported bauxite, coal and alcohol for fuel manufacturers" should be "paid to District Director, U.S. Customs." *Id*. Users paid the other ship dues "directly to the Port Authority," except cargo for which VIPA did not specify a collector. *Id.* The 1996 amended Marine Tariff continued the same collection structure as the 1976 Marine Tariff, directing collection of wharfage and ship dues by CBP. *Id.* at 260-62.

Although VIPA's Marine Tariff has published the rates for wharfage and tonnage fees from 1969 through the present, the Marine Tariffs do not address under what authority VIPA directed collection by U.S. Customs. The Marine Tariff also do not address how the amount collected was to be remitted to VIPA or whether CBP was permitted to reimburse itself for the cost of collection.

In 1992 the governor of the Virgin Islands wrote to CBP to advise it of two "policy decisions of the Virgin Islands government":

> 1) Collections of wharfage and tonnage fees by the U.S. Customs Service on behalf of the Government of the Virgin Islands should be treated in the same manner as the collection of customs duties.
>
> 2) The U.S. Customs Service is hereby authorized to apply the cost of making wharfage and tonnage fees collections on behalf of the Government of the Virgin Islands to all other collections made on its behalf and thereby eliminate the need to establish any reserves.

Def.'s App. 315.

VIPA was not a signatory to this letter nor was it referenced in the letter or copied on receipt. The letter did not indicate by what statutory authority the governor directed that wharfage and tonnage fees should be treated in the same manner as customs duties, but the parties do not dispute that CBP collected wharfage and tonnage fees both prior to and after the governor's letter.

Two years after the governor's letter, the Virgin Islands entered into a memorandum of agreement with CBP to govern the "costs chargeable to the Virgin Islands Deposit Fund 20X6157" for CBP expenses ("1994

MOA"). Def.'s App. 318. The parties do not dispute that the 1994 MOA reduced to writing the existing arrangement between CBP and the Virgin Islands government under which CBP collected duties, taxes, wharfage and tonnage, and other fees and then remitted the amounts collected, less CBP's cost of collection, to the Virgin Islands Deposit Fund. Furthermore, the parties do not dispute that the Virgin Islands government controls the Virgin Islands Deposit Fund.

The 1994 MOA governed how CBP would track and report collections and other activities, reimburse itself from collections "for the full cost of operating the USVI district," and remit the remaining sum to the Virgin Islands Deposit Fund. *Id.* at 325. It provided the basis for identifying which activities are reimbursable from the collections and for computing reimbursable costs. *Id.* at 318. It also provided that, should the collections fail to cover CBP's costs, the Virgin Islands government would reimburse CBP for its costs in excess of collections. *Id.* at 325. "Tonnage and wharfage" were included in the list of permissible CBP collections in the 1994 MOA. *Id.* VIPA was not a signatory to the 1994 MOA and it was not referred to within the 1994 MOA.

Although CBP made reports on individual categories of collections, its reimbursements were not calibrated to reimburse CBP for solely the cost of collecting wharfage and tonnage fees from the wharfage and tonnage fees collection. *Id.* at 320-21. Instead, wharfage and tonnage fees were treated as a part of the broader pool of line and support activities eligible for expense reimbursement. *Id.*

Article XIV of the 1994 MOA prescribed an amendment process, stating,

> Any change required by the USVI Government or Customs in the provisions of this MOA shall be initiated by the requesting party in a written statement setting forth the exact nature and reason for the change. Both parties agree that the attachments to this MOA are not static representations of organizational groups, data sources, cost drivers, etc., and that should Customs determine a change is merited and justified (e.g., the change would provide better representation of a particular activity, internal reorganizations have occurred, etc.), this change will be acceptable to the USVI and become effective subject to written notification of the change.

*Id.* at 326-27.

The Virgin Islands and CBP listed the following sources of authority for the 1994 MOA:

| | |
|---|---|
| 48 USC § 1406h | "Taxes, duties and fees as funds for benefit of municipalities; appropriations" |
| 48 USC § 1406i | "Taxes and fees; power to assess and collect; ports of entry; export duties" |
| 48 USC § 1469c | "Availability of services, facilities, and equipment of agencies and instrumentalities of the United States; reimbursement requirements" |
| 19 USC § 58c | "Fees for certain customs services" |
| 19 USC § 267 | "Compensation for overtime services; fixing work hours" |
| P.L. 103-66 § 13811 | "Overtime and premium pay for Customs officers" |
| E.O. 2620 | Executive Order 2620, dated May 15, 1917, signed by President Woodrow Wilson |

*Id.* at 326.

The 1994 MOA did not identify the recipient of any wharfage and tonnage fees transmitted to the Virgin Islands Deposit Fund after reimbursement. No oral or written agreements have been alleged to demonstrate that CBP had a separate agreement with VIPA regarding wharfage and tonnage fees, and the depositions of the executive and assistant executive directors of VIPA for the relevant period confirm that no other oral or written agreement other than the 1994 MOA governed the fee collection process. *E.g.*, Def.'s App. 5, 6, 28, 31. Moreover, VIPA officials testified that the Marine Tariff itself was not considered a separate authorization for CBP to collect the wharfage and tonnage fees. *E.g.*, Def.'s App. 5, 6, 28.

8

The parties do not dispute that VIPA and the Virgin Islands government had a separate process for transferring the wharfage and tonnage fees to VIPA after the amounts collected, less CBP's expenses, had been placed in the Virgin Islands Deposit Fund by CBP. *E.g.*, Def.'s App. 5, 6, 23, 46. VIPA does not contend that it had control over or even access to the Virgin Islands Deposit Fund. A spreadsheet attached to a 2009 letter from the Virgin Islands governor to the Secretary of the Department of Homeland Security reflects the process of CBP collection, remission to the Virgin Islands Deposit Fund after reimbursement for expenses, and then the Virgin Islands government's deduction of another five percent fee before remitting any remaining wharfage and tonnage fees to VIPA. *Id.* at 151-52. The parties have not been able to locate a copy of this purported agreement between VIPA and the Virgin Islands government, however.

As the years passed, CBP's cost of operating in the Virgin Islands grew and ultimately exceeded total collections. VIPA contends that it struggled to fulfill its statutory responsibilities without sufficient residue from wharfage and tonnage fees collected by CBP. Thus, from 2006 to 2010, VIPA undertook a series of actions and commenced correspondence with CBP and with the Virgin Islands government in an effort to persuade CBP to permit VIPA to take over collection of wharfage and tonnage fees.

VIPA began by removing directions to pay wharfage and tonnage fees to CBP from the 2006 Marine Tariff, which was in effect between 2008 and 2011, the period in dispute. Consistent with the prior Marine Tariffs, VIPA's 2006 Marine Tariff notified port users of a variety of fees, including wharfage and tonnage fees. Def.'s App. 277-94. It defined wharfage as a charge assessed for the service or use of a wharf that was assessed per passenger on a cruise vessel or in terms of tons of cargo unloaded. *Id.* at 282-84. "Ship dues" are "a fee charged against all vessels, except cruise vessels, entering a harbor or port under the control of the Virgin Islands Port Authority which shall be applied to cargo and passengers." *Id.* at 282. The 2006 Marine Tariff assessed ship dues in terms of tons. The 2006 Marine Tariff gave no direction as to who was to collect wharfage and tonnage fees.

On September 22, 2006, VIPA wrote to the governor of the Virgin Islands "formally request[ing] your approval of a proposed change in the procedure utilized to collect customs fees." Def.'s App. 115. VIPA wrote that it "proposes to collect customs fees directly." *Id.* at 115. It argued that doing so would "eliminate the disputes caused by the Department of

9

Finance's persistent failure to promptly or timely transfer said customs fees to VIPA." *Id.* at 115. The governor's signature appears on the "approved" blank at the end of the letter. *Id.* at 116. VIPA contended at oral argument that this letter with signature approval by the governor meant that CBP was legally required to cease collecting wharfage and tonnage fees.

On April 11, 2007, VIPA wrote to CBP advising it that VIPA did not understand wharfage and tonnage fees to be within the grant from Congress to administer customs law. Def.'s App. 113-14. It was "appealing to [CBP] so that it can start to collect port fees and charges as listed in its tariff." *Id.* at 113. Plaintiff attached the 2006 letter bearing the governor's signature. The 2007 letter did not reference any agreement between VIPA and CBP. It only discussed United States law and the 1994 MOA. VIPA offered to submit additional materials and hold discussions with CBP. VIPA contended at oral argument that this letter was a demand letter to CBP effectively ending CBP's authority to collect wharfage and tonnage fees.

CBP denied VIPA's request in a August 24, 2007 reply letter. Pl.'s Ex. Am. Compl. 27-29. In its reply letter, CBP stated that, pursuant to the Revised Organic Act, 48 U.S.C. §§ 1406h, 1406i, 1642a, and the related Danish customs law, wharfage and tonnage fees were within CBP's mandate from Congress to collect in the Virgin Islands, even without the 1994 MOA or VIPA's approval. CBP further stated that its reimbursement for the full cost of its collection activities was authorized by statute and the 1994 MOA. The government conceded at oral argument that, contrary to the position taken in this letter, the United States no longer contends that wharfage and tonnage fees were included in CBP's authorization to administer Virgin Islands customs law pursuant to 48 U.S.C. §§ 1406h, 1406i, 1642a.

Until December 2011, the parties continued to discuss via letters and meetings who would collect wharfage and tonnage fees and how the collection would be remitted to VIPA. After negotiations among the three parties, VIPA adopted Resolution No. 002-2011 on December 22, 2010, which stated VIPA was authorized to "take such action as it deems just and legal to permit VIPA to collect its own fees currently collected by CBP, in the event negotiations as outlined above fail to resolve the issue of VIPA's removal from the MOA . . . on or before February 28, 2011." Def.'s App. 158-59. On February 23, 2011, VIPA wrote to CBP to inform it that on March 1, 2011, VIPA would begin collecting the wharfage and tonnage fees. *Id.* at 154.

VIPA began collecting wharfage and tonnage fees for itself on March 1, 2011. CBP ceased collecting wharfage and tonnage fees at that time. CBP and the Virgin Islands amended the 1994 MOA in 2014 to reflect the changes in collection of the wharfage and tonnage fees.

In its briefing, the United States persisted in arguing that its authority to collect wharfage and tonnage fees was based on 48 U.S.C. §§ 1406h, 1406i, 1642a. At oral argument, however, the government dropped that assertion and contended that it was authorized to collect wharfage and tonnage fees pursuant to the federal reimbursable services statute, 48 U.S.C. § 1469c, and the 1994 MOA. VIPA responds that, even if collections were authorized at some point in time pursuant to the reimbursable services statute and the 1994 MOA, VIPA revoked such authority in its 2007 letter to CBP.

DISCUSSION

The novel issue before the court is whether plaintiff states a cause of action for either an illegal exaction or a constitutional taking.[2] We deal with the illegal exaction claims first.

I. The Illegal Exaction Claims

Defendant moves for summary judgment on counts three and four of plaintiff's amended complaint for illegal exaction. Plaintiff moves for summary judgment on count III(A) for illegal exaction, but merely opposes summary judgment on count III(B) and IV for illegal exaction.

VIPA advances three illegal exaction arguments. Plaintiff first

---

[2] Defendant also moves for summary judgment on counts one and two of plaintiff's amended complaint, which allege a breach of contract based on a theory of implied in fact contract with CBP or based on its being a third party beneficiary to the 1994 MOA. Plaintiff dropped these contract counts in its principle brief on the motion for summary judgment. Pl.'s Cross Mot. Summ. J. 1, 3. Plaintiff concedes that VIPA did not have an implied in fact contract with CBP to collect wharfage and tonnage fees and that it was not an intended beneficiary of the 1994 MOA. Therefore, we grant summary judgment to defendant on counts one and two of the amended complaint.

argues that CBP illegally exacted its port fees when CBP continued to collect VIPA's wharfage and tonnage fees after plaintiff tendered its 2007 letter requesting that CBP cease collecting those fees. The government responds that VIPA has not established an illegal exaction because VIPA did not pay money to the government directly or in effect and because the statutory basis for its claim does not expressly or impliedly provide for money as the remedy in the event the government misapplies the statute.

We begin with *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967), in which the Court of Claims described two classes of non-contractual claims over which Tucker Act jurisdiction can be asserted. First, a plaintiff may bring a claim for illegal exaction when "plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Id.* The second class of claims are those in which plaintiff has not, directly or in effect, made a payment to the government, but instead claims that a provision of federal law "grants the claimant, expressly or by implication, a right to be paid a certain sum" by the government. *Id.* An example of such a money-mandating statute is the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 (1994). "One is the flip side of the other": the first class of claims is founded on "the absence of statutory authorization" while the other "is founded on statutory authorization." *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1579 (Fed. Cir. 1996) (Nies, J., concurring).

Plaintiff's claims fall within the first class the court described in *Eastport*: plaintiff argues that the government's interception of the wharfage and tonnage fees that VIPA would otherwise receive from port customers constitutes a direct or in effect payment to the government. It further argues that there was no authority for CBP to direct such payments to itself after receiving VIPA's 2007 letter. The suit amounts to a plea of *quo warranto*: by what right do you, the government, presume to act? We see no further obligation, under this first class of illegal exaction claims, for a plaintiff to point to anything in the statute or regulation on which the government relies that anticipates an abuse of the statute and authorizes the plaintiff to sue for return of the monies. Plaintiff need not point to a money-mandating provision, because the necessary remedy to the government improperly using its authority to place "a citizen's money in its pocket" is a return of that sum. *See Aerolineas Argentinas*, 77 F.3d at 1572-74 (discussing Tucker Act jurisdiction over illegal exaction claims in which the government misapplied statutory or regulatory authority to exact or direct

12

payment of a sum).

Thus, we turn to whether the government had plaintiff's money in its pocket: VIPA must demonstrate that the government has required payment, directly or in effect. *Eastport S.S. Corp.*, 178 Ct. Cl. at 605. Plaintiff contends that CBP collecting its fees after the 2007 letter constituted a direct payment of VIPA fees to CBP, because CBP had possession of fees that VIPA asserted it alone had the right to collect. Because CBP was at best acting as a collection agent of VIPA's fees, rather than requiring VIPA itself pay a sum to CBP, the government did not directly exact funds from plaintiff. Plaintiff also contends, however, that CBP's collection constituted an in effect payment.

Defendant argues that CBP's collection of the fees cannot constitute an "in effect" payment, because they are limited to cases in which the government directed plaintiff to pay a third party, as in *Aerolineas Argentinas*, 77 F.3d at 1568, or seized plaintiff's property, sold it, and retained the proceeds, as in *Bowman v. United States*, 35 Fed. Cl. 397, 399-400 (1996). We disagree. Here, CBP stepped in between port users and plaintiff and redirected payment to itself. If CBP had ceased collection as requested, the same fees would have been collected and retained by VIPA pursuant to its authority under local law. Ultimately CBP intercepting the collection had the same result as CBP instructing VIPA to turn the fees over to the government immediately after collection. The category of "in effect" payments is broad enough to embrace a circumstance in which the government directs payment of funds to itself that VIPA asserts it had the statutory right to collect. *See Fireman v. United States*, 44 Fed. Cl. 528, 536 (1999) (noting that illegal exaction is not strictly construed after *Aerolineas Argentinas*). Thus, CBP's interception of the fees amounts to an "in effect" payment.

The question remains, however, whether CBP acted in contravention of the law when it intercepted VIPA's wharfage and tonnage fees. The difficulty for plaintiff lies in its inability to demonstrate that anything the government has done was a violation of federal law. To prove an illegal exaction has occurred, plaintiff must demonstrate not only that it has in effect paid money to the government but also that "the authorization on which the [government] relies was misinterpreted, misapplied, or invalid." *Aerolineas Argentinas*, 77 F.3d at 1574. Admittedly the government has confused the issue here repeatedly by asserting and then abandoning a right under the Revised Organic Act sections 1406h, 1406i, and 1642a, now

contending that its authority to collect wharfage and tonnage fees and reimburse itself for the cost of its operations arises under the reimbursable services statute, 48 U.S.C. § 1469c, as well as the 1994 MOA. Plaintiff responds that neither the Revised Organic Act provisions, the reimbursable services statute, nor the 1994 MOA confer authority on CBP to collect the wharfage and tonnage fees.

We begin with the federal law on which CBP relies: the reimbursable services statute.[3] Plaintiff does not question that Congress validly enacted the statute and that it was in effect at the time of the 1994 MOA and thereafter. That statute provides that an agency of the federal government may make "services, facilities, and equipment" available to "the governments of the territories . . . ." 48 U.S.C. § 1469c. Nor does Plaintiff question that this statute allows a territory, such as the Virgin Islands government, to request services from CBP, which CBP is authorized to provide on a reimbursable basis. *Id.*

Moreover, plaintiff has not challenged the authority of the Virgin Islands government to enter into the 1994 MOA, which expressly incorporated the reimbursable services statute as part of the authority for CBP's collection operations and for self-reimbursement. Given plaintiff was neither a party to nor an intended beneficiary of the agreement, it would be awkward indeed for VIPA, a creature of the Virgin Islands government, to challenge as a third party an agreement between two sovereign entities. And it would be even more awkward for the court to collaterally question the bona fides of that agreement. On the face of it, the reimbursable services statute coupled with the 1994 MOA authorized CBP to collect wharfage and tonnage fees on behalf of VIPA until the agreement was formally amended in 2014. CBP was asked to provide services on a reimbursable basis by the Virgin Islands government and provided that service pursuant to that statutory authority, not in the absence of it.

Plaintiff did not object to the arrangement entered into between the Virgin Islands government and CBP for many years prior to or after the

---

[3] Although the government has since abandoned that source of authority, the Revised Organic Acts did incorporate the Danish customs law and regulation as the custom law and regulation of the United States Virgin Islands. That custom law and regulation, which Congress directed the Secretary of the Treasury to administer, included ship dues. Those ship dues were the same type of port user fee assessed as those that are currently collected.

1994 MOA. It was not until 2007 that it wrote a letter to CBP requesting that CBP cease wharfage and tonnage fees collection. The record of VIPA's communications with CBP, some of which were admittedly endorsed by the governor of the Virgin Islands, is set out above. VIPA waited until December 2010, however, to adopt a formal resolution that asserted its statutory authorization to both set and collect the fees. Plaintiff's current argument therefore devolves to this: at some point between 2006 and 2011, CBP lost the authority to implement the 1994 MOA with respect to wharfage and tonnage fees. The question is whether a dispute over who had the authority to direct the collection of fees is what case law construing the Tucker Act contemplate as a type one illegal exaction claim. We think not.

Looking to case law in which an "in effect" payment was alleged, we do not find a circumstance in which local law and a local governing body's authority are caught up in the issue of the federal agency's authority to act. Plaintiff's case citations are distinguishable. It relies, for example, on *Fireman*, in which plaintiff made illegal donations to a political campaign. 44 Fed. Cl. at 530-31. The campaign committee turned the donations over to the United States Treasurer, following a Federal Election Commission Advisory Opinion interpreting federal law. *Id.* The FEC had issued advisory opinions that allowed campaign committees to turn money over to the government rather than return it to the contributor. *Id.* at 536-37. When plaintiff sued for the return of the donation from the Treasurer, the Court of Federal Claims held that plaintiff had stated a claim for illegal exaction due to the likely misapplication of federal law by the FEC. *Id.* Similarly, the "in effect" payment at issue in *Aerolineas Argentinas* required the court to determine whether the Immigration and Naturalization Service had properly interpreted federal law to permit it to require the airlines to pay expenses of detained aliens. 77 F.3d at 1570-72. In both instances, a plaintiff alleged that an agency acted beyond its authority or failed to perform a requirement that resulted in an exaction of money, in contravention of federal law. *See also eVideo Owners v. United States*, 126 Fed. Cl. 95 (2016); *Eastport S.S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967).

Here, on the other hand, plaintiff argues that CBP acted in contravention of a local statute and VIPA's demand letter. In any event, VIPA's 2007 letter was not effective to revoke the 1994 MOA according to the terms of the MOA itself. At best, the 2006 letter signed by the governor initiated the amendment process, which was not complete until 2014.

The focus of an illegal exaction claim brought in this court is

whether the United States government has the citizen's money in contravention of United States law. CBP provided services that it was authorized to provide pursuant to federal statute. 48 U.S.C. § 1469c (2012). It provided those services to a territory's government, at that government's request, as CBP was authorized to do. *Id.* Moreover, the collection of wharfage and ship dues was closely related to the very nature of services that Secretary of the Treasury had been instructed by Congress to provide since 1936. The collection of wharfage and tonnage fees had followed this collection arrangement since at least the 1960s. CBP relied, without dispute from VIPA, on the representation of the government of the Virgin Islands that it had the authority to request such services and enter an agreement to govern those services. CBP did not contravene United States statutes or regulations regarding its authority to collect fees in the Virgin Islands. We thus decline to extend the theory of illegal exaction to circumstances in which the asserted illegality does not arise under federal law. We grant defendant's motion for summary judgment on count III(A) and deny plaintiff's cross-motion.

The real dispute lies between a creature of statute, the independent government agency VIPA, and its creator, the government of the Virgin Islands, regarding how local government authority could be exercised to request or direct CBP to collect the fees in the first instance and then continue to do so pursuant to the 1994 MOA. If VIPA is correct that CBP did not have the authority to collect the fees, it is correct because Virgin Islands law—not United States law—did not grant the Virgin Islands government authority to direct the collection of those fees by CBP.

Plaintiff also offers two other theories of illegal exaction based on CBP's asserted excessive reimbursement for its collection activities. First, plaintiff contends that CBP reimbursed itself for expenses in excess of those permitted by the Revised Organic Acts or the reimbursable services statute. Additionally, plaintiff alleges that CBP reimbursed itself from the Virgin Island Deposit Fund for expenses ineligible for reimbursement, such as COBRA user fee services and immigration and agricultural inspections. The illegal exaction analysis remains the same, however: did the government exact payment from VIPA, directly or in effect, and was that exaction in contravention of statute or regulation?

Plaintiff's excessive reimbursement theories assume that CBP properly collected the wharfage and tonnage fees. These two claims posit that the exaction occurred after collection at the moment when CBP

reimbursed itself for expense of collections. Plaintiff's arguments thus assume that CBP was authorized by statute and the 1994 MOA to reimburse itself for some expenses, but it in fact retained too much of the Virgin Islands collections and included ineligible expenses in its reimbursements.

The following undisputed facts are relevant to whether CBP exacted payment from plaintiff through excessive reimbursement: CBP collected more than simply wharfage and tonnage fees and reimbursed itself using the methodology prescribed in the 1994 MOA, which permitted reimbursements from the gross amount of collections for enumerated activities. CBP did not remit wharfage and tonnage fees collection to VIPA, but rather remitted any excess collection over expenses to the Virgin Islands government, pursuant to the Revised Organic Act provisions and the 1994 MOA. VIPA was not a party to the agreement under which CBP reimbursed itself and neither did it own or operate the fund into which collections were deposited. After CBP's deposit, the Virgin Islands government would remit wharfage and tonnage fees to VIPA after deducting its own five percent administrative fee. What these facts make clear, as defendant points out, is that, when CBP reimbursed itself, CBP exacted payment from the Virgin Islands Deposit Fund and the Virgin Islands government which maintained the fund, not from VIPA.

But there is a more fundamental problem with this line of argument. Setting aside the question of the entity from whom the government exacted a payment, CBP did not misapply, misinterpret, or misconstrue its authority to reimburse its expenses. The Revised Organic Act provisions authorized reimbursement for the costs of collecting customs duties, which the 1994 MOA reflects CBP collected in the Virgin Islands. The reimbursable services statute permit an agency to reimburse itself for the "services, equipment, and facilities" provided to a territory. And the 1994 MOA contemplated reimbursement for the "full cost of operating in the district," based on statutory and regulatory authority underlying the agreement.

Plaintiff's real argument is not the absence of *any* authority for CBP to reimburse itself, but rather the *way* in which it calculated reimbursement. The facts in dispute here are the individual line items of reimbursements that CBP made for particular operations in the Virgin Islands. Plaintiff contends that these excessive reimbursements included expenses that properly should have been paid, for example, by COBRA user fees. Plaintiff also argues that some operations, such as agricultural and immigration inspections, were improperly charged to the Virgin Islands

Deposit Fund. Such a challenge is not to the authority to act but to the details of how the calculation was done. Such disputes are not within this court's Tucker Act jurisdiction.

VIPA's excessive reimbursement theories would draw the court into a dispute construing the language of an agreement, one party to which, the Virgin Islands government, is not before this court. Furthermore, the excessive reimbursement theories would pull a thread on a tangle of accounting questions that reach beyond whether CBP had proper authority under the law to reimburse itself. A disagreement over the mechanics of how CBP reimbursed itself is well beyond the court's role in determining an illegal exaction *vel non* under federal law. Thus, we also grant defendant's motion for summary judgment on counts III(B) and IV, illegal exaction based on excessive reimbursement.

II. The Takings Claim

Defendant finally moves for summary judgment on count five of the amended complaint, in which plaintiff argues that CBP's allegedly excessive reimbursement constitutes a taking under the Fifth Amendment Takings Clause. The Fifth Amendment to the United States Constitution guarantees that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Defendant argues that plaintiff does not have a property right in the fees that it expected to collect or receive from the Virgin Islands government. Alternatively, defendant argues that CBP's collection and reimbursement under the 1994 MOA did not constitute a taking.

We are not persuaded by the government's argument that VIPA does not have a property right to assert in a Fifth Amendment takings claim: Virgin Islands law granted VIPA the right to set and collect port fees. V.I. Code Ann. tit. 29, § 543(12) (2017). Nevertheless, plaintiff's takings claim requires us to assume that CBP lawfully collected VIPA's port fees pursuant to statutory authority and the 1994 MOA. *Rith Energy v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("[T]his court assume[s] that the underlying governmental action was lawful, and . . . decide[s] only whether the governmental action in question constituted a taking for which compensation must be paid."); *Tabb Lakes Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) (To bring a takings claim under the Tucker Act, 28 U.S.C. § 1491, the "claimant must concede the validity of the government action which is the basis of the taking claim."). It follows that

we must also assume that CBP is lawfully permitted to reimburse itself from the total collections. On those assumptions, plaintiff's claim is merely that CBP miscalculated how much it was permitted to deduct to reimburse itself from the Virgin Islands Deposit Fund pursuant to federal law.

Plaintiff argues that, although some reimbursement was appropriate, the amount permitted by United States law differed from the amount CBP actually reimbursed itself. Plaintiff's contention boils down not to a taking in which CBP physically or by regulation deprived a plaintiff of its property right, but rather a dispute over enforcement of statutory, regulatory, or contractual provisions. Such disputes belong in a forum authorized to enforce administrative procedures, such as the district courts, or, particularly insofar as the dispute concerns plaintiff's argument that CBP has improperly reimbursed itself based on the COBRA user fees statute, the Court of International Trade. *See, e.g.*, *Princess Cruises Inc. v. United States*, 217 F. Supp. 2d 1361 (Ct. Int'l Trade 2002); *Norfolk & Western Ry. Co. v. United States*, 869 F. Supp. 974 (Ct. Int'l Trade 1994). Therefore, we grant defendant's motion for summary judgment on count five of the amended complaint.

CONCLUSION

We grant defendant's motion for summary judgment and deny plaintiff's cross-motion for partial summary judgment. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink  
Eric G. Bruggink  
Senior Judge